Case No. 14-1226 et al. Oak Harbor Freight Lines, Inc. Petitioner v. National Labor Relations Board. Mr. Kirsten L. for Petitioner, Oak Harbor Freight Lines, Inc. Mr. Lee Lee for Petitioner, Kansas Local 81 et al. Mr. Kansas, Respondent. Mr. Kirsten L. May it please the Court, Peter Kirsten L. for Petitioner. Oak Harbor, Oak Harbor respectfully requests that this Court grant Petitioner... Sir, I'll need to speak a little more. It may not be the right height for you. Petitioner respectfully requests that the Court grant its petition to find that Oak Harbor did not violate the Act by ceasing contributions to the Oregon Trust Fund or by placing returning strikers on the company's medical plan. This case is essentially about three things. Waiver, estoppel, and Section 80 of the National Labor Relations Act. The company, after lawfully suspending contributions after canceling subscription agreement, offered to make contributions and nothing precluded the union thereafter from accepting contributions, especially after the strike concluded on behalf of all employees. But instead it insisted that the petitioner sign an interim agreement and subscription agreement before resuming contributions into the Trust Fund. This is essentially an abrogation of the company's Section 80 rights. It has a right not to agree to anything. It has a right not to sign anything. And the Board went seriously off the rails in finding that the company was obligated to sign these agreements in order to avoid liability. That's essentially what would happen in this particular case. We wouldn't be here if the union had simply, or the Trust Funds, had simply accepted contributions to the Trust Fund. Can I ask about that? I'm a little unclear. For the purpose of this part of your argument, if you could just accept that you're right about three of them, that is, that three of them could cancel, but as to the fourth, you were to uphold the Board that the cancellation of the fourth one was not permitted, just for the purposes of answering this question. Did the Board, and I'm talking about now the fourth one, not just about the organ. Yeah. Okay. What was the status quo if, in that circumstance, where you were not allowed to cancel? The status quo irrevocably would have been company medical benefits because the only way that the union and Trust Funds would permit contributions or resumption of contributions was if an interim agreement or subscription agreements were signed. But if the cancellation was unlawful, then the status quo is supposed to be what existed under the CBA, right? That's sort of the definition. Right. And under the CBA, it was contributions to the health, to the fund, to the trust, right? Right. So shouldn't that have been the status quo in that circumstance? Your Honor, in that circumstance, there's still one fact that needs to be considered, and that is that the union refused to accept contributions for Oregon Trust, not the accepted contributions for Oregon Trust. No, it's not the union. I'm sorry. The Trust Fund. Yes. The union and the Trust Fund. The Trust Fund refused to accept contributions. Right. It wasn't the union. On behalf of the administering the Trust Funds on behalf of the union, the union throughout has been copied on or was part and parcel of the discussions related to refuses to accept funds. The Trust Funds are set up for the benefit of the employees, for the benefit of the union members. All right. So you're saying that in that circumstance, the status quo would have been contributions to the Trust Fund, right? The status quo, because of the intervening circumstance, that is, the union refusing contributions, the status quo is refusal of contributions in a company medical plan. That was the status quo. You keep saying the union. The Trust Fund. Right? It was the Trust Fund. Exactly. No, this is critical. Yes. You've said it twice now. It was the Trust Fund that notified the employer, your client, that it would not accept these contributions. Correct. All right. And there were discussions with the union throughout regarding this very factor. So what we had is conduct, consistent conduct on part of the union and the Trust Funds for over a year and a half that would reasonably lead the employer to believe there had been a valid subscription agreement for the working trust. This comes to the equity issue. That's not what I'm asking about. I'll let you get back to your argument. I'm just trying to understand this one thing. Your position is that the status quo under the CBA was the contributions, and with respect to a CBA where you are not allowed to cancel, that would continue to be the status quo. Is that right? But you claim they won't let you do it, and so you have an equity argument or you have an economic problem. Right? One of those two. But for the refusal, I would say that that is correct. Okay. Now, with respect to the ones where the board held that you unlawfully canceled, I want you to accept for the purpose of this argument that it was unlawful. So what's the status quo for those? I think the status quo throughout is you have to take a look at what the actions, the intervening circumstances, the intervening actions of the Trust Fund and the unions are in that regard, just as within Manitowoc ICE, where you have intervening actions of the House of Trustees that irrevocably changes the status quo, particularly in this case. Remember that the company has an unabridged right not to be compelled to sign any agreements. That's a subscription agreement, that's an interim agreement, any agreement, or agree to any proposal, make any concessions. But you have to continue the status quo. You have to continue the status quo. So that's why I'm asking, what was the status quo if you unlawfully canceled? Well, if you unlawfully canceled, it was whatever was in the collective bargaining agreement. Right. And so the status quo would have been contributions, right? That would have been the status quo. It would not have been the company's plan. No, not with respect to the medical benefits. It would not have been. But there was an intervening circumstance here, and that intervening circumstance was the refusal to accept contributions. Is your position that the intervening circumstance changed the status quo or that the intervening circumstance gave you one of your defenses? It did two things. It did change the status quo to being company medical benefits, to which the union agreed for that interim period. But those company benefits were only for the crossovers. It was. It wasn't for the strikers. But when the company pursuant to express provisions in the subscription agreement cancels the subscription agreement, and then the union says, do not give us contributions. The trust says, do not give us, because the trust will only accept contributions on behalf of all the employees, not a subset. I mean, this is critical counseling. Ignore. I'm not ignoring that, Your Honor. Well, you keep referring to the union refusing. Yes, that's mistaken. The union wasn't in control of that. The union was involved throughout. Whether the trust would accept contributions or not. The union was involved throughout this particular matter, and this was done on behalf of the union. And when the trust funds refused to accept contributions during the bargaining, we have a requirement that an interim agreement and subscription agreement be executed. And that butts up against the company's 8D right not to have to agree to anything, not to have to sign any agreements. Once the company cancels the agreements, pursuant to express provisions of the subscription agreement, and then the union and trust funds act consistently with the existence of a valid Oregon subscription agreement, which was validly canceled, then we have a course of conduct for a year and a half thereafter, which made it clear to the company, at least, that there was, in fact, existing subscription agreements for all four trusts, that they were validly canceled, and the union is saying do not give a subscription agreement. Let me be clear. The board says it was petitioner and your client's burden to show that there was a subscription agreement as to the Oregon trust, that you did not, your client did not meet that burden. And the board, that analysis is incorrect. It was a burden to show that, but not that there was necessarily an existence of a subscription agreement. That's where the estoppel argument comes in. No, the board said, based on the record before it, where your cancellation letter said, if there is a subscription agreement as to the Oregon trust, we are exercising our right to cancel. The board said it was your burden, your client's burden, to demonstrate that there was such a subscription agreement that gave you the right to cancel. And the board said you never proved that, and yet you acted as though there were such a right. Your response is, as I understand it, well, everybody assumed there was a right. The response is that the conduct of the trust funds and the union for more than a year and a half after the conditional cancellation of the subscription agreement would lead a reasonable person to rely to their detriment that there was a subscription agreement. When you knew that the trust would only accept contributions on behalf of all covered employees, it would not accept contributions on behalf of a subset. The trust in unions never said during this period of time that it would only accept contributions. But that was in the agreement. It wasn't a question of anybody saying it. That's not what we understood, Your Honor. Why did you understand that when the trust told you? The trust did not tell us that. It said it's not going to accept on behalf of a subset. It didn't say that. It didn't make any reference to the acceptability of the trust. It didn't use that precise word. If so, Your Honor, that would only apply to that discrete period between the time when the subscription agreements were canceled and until the strike ended. Then thereafter, the subscription agreements, they were saying, do not provide us with any type of contributions, and the only way you can get back into the subscription agreements, resuming contributions, is by signing an interim agreement and subscription agreements. By the way, subscription agreement for Oregon Trust. If, in fact, you needed a subscription agreement for the Oregon Trust, too, Your Honor, then why prior to September of 2008 was the trust accepting contributions on behalf of the Oregon Trust? But your question starts on an assumption, and the board said the language of the Oregon Trust did not require a subscription agreement. And for years, contributions had been made without a subscription agreement. And then the union required, the trust funds required, that a subscription agreement be executed in order to receive contributions from the Oregon Trust. When did the trust fund require that? Throughout. Throughout after this particular period. They said, do not give us contributions. No, that was the union's position, not the trust fund's position. Not until, Your Honor. After the Oregon Trust. Your Honor, not until July of 2010, at the ALJ hearing itself, did the Northwest Administrator's witness say that they would accept contributions. He said a week prior to that, it was determined that he would be permitted to accept contributions. Before they say, well, we think there is one, but nobody ever located it. And after that, you sent your letter of cancellation saying, if there is such an agreement, we exercise our right to cancel. So you accepted the fact that that right arose only if there were subscription agreements. And as I understood the board, it was saying, you never met your burden to show that there was such a subscription agreement as to the Oregon Trust. Isn't that what the board held? What the board held is, yes. And what the board fell short of is its own precedent in Manitowoc Ice, where the conduct of a party can lead someone to believe that, for example, in this case, a subscription agreement existed. And then that party, the party who did the misleading, so to speak, is stopped from asserting otherwise. And so the trust is the party here. You keep saying it's the union, but it's the trust that says it won't accept these contributions. So you're saying the trust is stopped from accepting, from not accepting these contributions? The union and the trust fund were both aware of the circumstances. Negotiations going on with the union throughout this entire period of time, from September through the return of the strike, both the union and the trust fund were part and parcel of the discussions with respect to the trust fund. To say that somehow the union and the trust fund were not at the same time making certain representations would be false. The union, when a party has an obligation to speak up where someone in their position would know that there was no subscription agreement. So let me be clear about your argument. Your argument is that notwithstanding the statutory status quo requirement, that when the trust notified you that it would not accept contributions on behalf of the group that you wanted contributions to be made for, and I refer to that as a subset, then because the union asked the employer to sign a subscription agreement to cover these employees, it thereby conceded that a subscription agreement must have existed prior to that time that gave the employer the right to cancel a contribution? That's part of the conduct, but by insisting that the employer sign a subscription agreement, it's asking the employer to abrogate AP rights. The insistence upon signing a subscription agreement in order to resume contributions is part of the litany of conduct that occurred over a five-month period that would lead a reasonable person to conclude that in fact subscription agreements existed and or that the union and trust fund should be stopped from asserting that a subscription agreement is not in existence. They said do not send contributions. They will not accept contributions. On behalf of this group. You want to ignore that, but that's the key here, isn't it? And I guess I don't understand. I thought the board's view was that the union's conduct related to the fact that the employer was refusing to make contributions. So it said, well, if you're saying you won't make them, then we've got to have another subscription agreement. Is that your argument? The union saying that they won't accept contributions without a subscription agreement compels the company to engage in conduct that's not required to engage in. Not the union. Union and trust fund. You keep saying that. It's in your mind. All right? And the union had no control over whether or not the trust accepted the contributions. That was the trust writing you, your client, on behalf of itself. But the union, as part of this, required an interim agreement to be signed, Your Honor. Okay. I'd like to address the three trusts other than the Argonne Trust. Vanessa, what is your understanding as to the nature of the remedy that the board has proposed? With respect to the Argonne Trust? No. No. The three trusts other than the Argonne Trust. The nature of the remedy is that the board found that there was a clear and unmistakable waiver with respect to that there was a subscription agreement. Right. So to the extent there was any kind of liability, it would be consistent with what the subscription agreement said. It would be. So what does the board's order do with respect to those three trusts? That's a good question, Your Honor. I hadn't thought about that. It was not part and parcel of our argument. I mean, looking at the order, I read it as simply saying that the company must bargain with respect to medical benefits. Correct. That's correct. There was an amendment upon the union's request. So the amendment would allow the union to continue whatever you're doing. I thought the finding was, look at the hearing officer's finding, and this is what the board adopted, was that as to this interim period, there had been this interim agreement. All right. But it only applied during that interim period, not as your client was arguing, also after the strike ended. So that the employer has to bargain for the union as to contributions as part of this new collective bargaining agreement, if it's ever reached, until such time as impact is reached. But that as to this interim period, the union had waived its right to contributions as to that period, and there would be no bargaining as to that. Correct, Your Honor. All right. But you have to read those two together to understand, I think, what's going on. And you can tell me I'm wrong, but that's what I understood the board to be saying. You understand what the board is saying. With respect to the Speed Trust, other than the Argonne Trust, which is not the Argonne Trust, there is no imposition on the company by duty to replicate the Speed Trust contributions to the Speed Trust. It's simply entirely open for bargaining between the company and the union. Switch, Your Honor. Your Honor, I see my time is up. I would just like to respectfully request that I find no liability for or violation of secession of the contributions to the Argonne Trust and from any company medical, or to remand the matter back to the board for proceedings consistent with Manitowoc guidance from which it departed without a reasoned explanation, or to at least provide an explanation. Thank you, Your Honor. We'll hear from Mr. Rennie. Thank you, Your Honor. May it please the Court, I'm Tom Lahine. I represent the teachers' locals in this case. The teachers are respectfully requesting that this Court grant their petition for review and reverse the portion of the board's decision where it found that Oak Harbor did not violate the act when it unilaterally ceased making contributions to the Retirees' Welfare Trust, the Washington Teachers' Welfare Trust, and the Western Conference of Teachers' Pension Trust. For today, we'll call those the three trusts. So does all of this turn on whether the subscription agreement is, A, either ministerial or, B, a contract of adhesion? Yes, and I'd also add whether or not it serves as a waiver. Yes, that's how I would say. I think that's the fundamental issues for this case. Correct. So Oak Harbor's obligation to pay into the trust fund is based on the collective bargaining agreement it has with the teacher locals. All of the trust funds, all three of these trust funds require a subscription agreement or an EU. The EU applies the pension plan. It's the same as a subscription agreement. So I'll refer to them all as subscription agreements for purposes of argument today. The subscription agreement is not barred, but it's signed by all three parties, the union, the trust, and the employer. After Oak Harbor gave notice that it intended to cancel the subscription agreement, it waited the five days, and then unilaterally ceased making contributions into the trust funds. The union filed an unfair labor practice saying, look, that's a unilateral change. We're not at impasse yet, and you stop making contributions into the trust funds. So let me understand this argument. I understand when you're saying that the subscription agreements are not bargained, but the union signs the agreement, doesn't it? And therefore, by signing it, it's bound to its terms, isn't it? It's bound to its terms, but it's our position that that's a contractual agreement. And it's signed by three parties. It's different from an agreement just between the union and the employer. It's a three-party agreement, the union, the employer, and the trust. You say that the power under the subscription agreement to cancel merely relieves the employer of its obligation to make contributions to the trust, but it does not relieve the employer of its statutory duty to maintain the status quo? That's correct. In this case, the status quo would be to continue to make contributions. And so the board rejected the argument that this was merely a ministerial agreement, and rejected the argument that this was a contract of a deed. Yes, that's correct. And I guess, why was it arbitrary and capricious in doing that? No. The reason why, well, first of all, it was arbitrary and capricious, because I think the evidence clearly shows that the subscription agreements are clearly ministerial documents. The trust wants them for two reasons. Again, these are required by the trust. The unions don't ask for them. The employers don't ask for them. These aren't changed or bargained. These are documents that the trust wants. The union opposed no objection. Yes, correct. And the rights opposed objection. I suppose it didn't work. Yeah, if it objected. Yeah, correct. The union does not have to sign. But the unions understand these are just ministerial documents, contractual agreements. So, let me be clear. If the union doesn't sign it, what happens? In other words, the collective bargaining agreement itself says that the employer shall contribute, hypothetically, $100 a month for each employee. So, then the employer has to find, under the Fast Heartly Act, an entity that can legally receive this money. So, that money goes to a trust. And the trust says, we will not accept this money unless we have an agreement. And the agreement is that we accept this money from the employer for the benefit of the union employee. Yes. So, you're saying the union doesn't even have to be a party to that agreement? No. The subscription agreement requires a union signature. And the trust requires the signatures from both the employer and the union because, number one, under Section 302 of the National Labor Relations Act, contributions to a trust fund have to be based on a written document. So, part of what the subscription agreement does, it tells the trust, hey, look, the union and the employer are both certified. There's a contract that these contributions are based on. There's a written document. So, that keeps everybody out of trouble. So, that's the one thing the subscription agreement does. No, but that's in the collective bargaining agreement itself, $100 a month per employee. Yes, that's in collective bargaining. But the subscription agreement confirms or certifies that the contributions are based on a written document because they both have to attest. So, I'm just trying to understand. I mean, the union couldn't object. If it objects, then the employer can't make the contribution. That's right. The subscription agreement requires both signatures. I mean, and if both parties don't sign, the trust can't accept the contributions. Those are the trust rules. And those are the trust rules under the Taft-Hartley Act. Those are the trust rules on their own internal trust. So, it's like I open an account with a bank and I have to sign a lot of documents, basically. Yes, that's analyzing. That's analyzing, Meg. It's just to sign up to open a checking account, you put your name, your address. It seems a little bit more than that. That is, the CBA plainly contemplates that there's going to be a written agreement of some kind with the trust. Right? Otherwise, there couldn't be a trust. It doesn't say anything about that. Well, it says, employees in a locating shall be bound by the provisions of the agreement and declaration of the for-reference trust. So, you knew that you had to know that there was going to be a subscription agreement of some kind, right? Oh, yes. No, the union, both parties fully know and expect that there's going to be a subscription agreement. If there was a bargain in a CBA to take care of employees' health via a Taft-Hartley trust, you know you're going to have to sign something, right? Correct. Yes, and you know, according to you, what that something is, right? Correct. And you say you couldn't change it. That's the adhesion argument. Correct. Right. But you didn't have to have a trust. That is, you could have a company health plan. You could have bargained for something else. If you didn't like the cancellation provision of the trust, there are other ways to get help for your employees, right? For your union members, I'm sorry. Yes, I mean, if your point is, look, we have other options, that is correct. I thought the Taft-Hartley Act specifically limited those options. No, no, that's a bit clear. The Taft-Hartley Act says that you can't take these contributions in a trust without a written agreement and all the other stuff, right? But it doesn't specify this kind of written agreement. That's correct. Yeah, there's no statutory agreement. And the Taft-Hartley Act does not prevent a union from agreeing to a company health plan. Correct. And I want to be clear, there's no, I'm not aware of the specific cancellation language in this subscription agreement. That's not cut and paste from a statute. That's not part of the statute at all. The statute doesn't say anything about cancellation. Yeah, yeah, I understand. Right. Are you saying, I'll take it there's no evidence in the record, are you saying every subscription agreement that every Taft-Hartley trust has this cancellation language in it? You know, I would assume so, but I don't know. You know, I can't say I've looked at every, you know, subscription agreement. And can you say that you're not allowed to, if the union and the employer want to take the cancellation language out? I can't say one way or the other whether the trust would have allowed it, right? Yeah, I don't know. I would assume this is what the trust requires. But let me just be clear. I thought the board found that as to the Oregon Trust, there was no requirement as to a subscription agreement. And you're saying what, that's just wrong as a matter of practice? There's two things. Since the Oregon Trust, you know, was first organized or started, there was a Supreme Court case, 1988 case, the advanced lightweight case that said, look, in order for a trust fund to get into federal court and sue for delinquent contributions on an expired collective bargaining agreement, you need a contract. Otherwise, you can't sue an employer that's delinquent on contributions. You can't get into federal court because there's no contract. So that subscription agreement now, the trusts want them because that serves as the contract. That allows the trust funds to get into federal court and sue for those delinquent contributions. So that's why it's a ministerial document. It's just for purposes of the trust to get into federal court as well as to certify, it's the best practices to certify that these contributions are based on a written document. But there's no best practice about having, in the way you described it, and no particular interest of the trust of allowing cancellation in the way in which that opening language provides. It's not like a bank having an adhesive contract. By the way, I don't know whether these are adhesive or not, but which says, you know, the bank has all the rights. You have no rights. You have to agree to this. You have to agree to that. You have to have an arbitration agreement, et cetera. This particular cancellation provision doesn't sound like it's to the benefit of the trust. It allows the union and the employer to cancel. Well, you know, I think it's there because if the parties were to bargain an impasse, and they bargained an impasse, and the employer implemented and said, look, we're no longer going to give contributions to this trust fund, it allows the employer a way to do that, to get out of that. That's not for the benefit of the trust. That may be to the benefit of the employer. But normally when you talk about a contract of adhesion, it's the party who you claim is forcing you to file the contract of adhesion. And that's here, in this case, the trust. It's not the employer. It's not the union. Well, the subscription agreement is the benefit of the trust because it allows them to get into the benefit of the trust, but not for the benefit of the union. Right? The trust is a separate independent entity. Correct. That's correct. That's correct. Okay. With respect to the cancellations that the board said were valid, okay, again, like you'd assume, like I asked opposing counsel, that the board was correct. What do you understand the status quo to be? If the cancellations were valid, what's the status quo for those circumstances? I'm not sure if I understand the question correctly. Well, what is it that they should have continued to do that they didn't by instead implementing a company plan? What was the status quo? Okay, are you referring to the Oregon trust? No, the three that the board said were valid. And I ask you to assume for purposes of this discussion, we won't hold it against you, that they were valid. The status quo was when in the bargain agreement, and that was to continue the contributions. How can it be the status quo if the board said they'd lawfully cancel them? It's not just that the contract ran out, it's that it included a provision in which, according to the board, the union waived its right to bargain about thereafter. Now, if that's correct, and I ask you to assume that, then what is the status quo with respect to the employees who were under those now-canceled plans? Well, again, I guess I'd say the status quo would still be the collective bargaining agreement. If what you're saying is that they had a right to cancel those, then the status quo … Assume that the CBA itself said the minute that this runs out, the employer has an absolute, complete right to stop contributions and we waive any complaint we might have. Assume we got all that language in there. That's the effect of what all of you said. Now what happens? Well, I think at that point, the bargaining would almost have to start from scratch. Is that what the board order here effectively says? Bargaining at this point should start. Well, I guess … That seems to be what it orders. Yeah, with the Oregon Trust … No, no. No, okay, I'm sorry, I'm sorry. Yeah, you essentially, yes, assuming those waivers are valid, you have to just start from, okay, you can't contribute to the trust anymore, the employer and you would have to get together and say, okay, now what do we do? What happens to the employees in the interim? That would be subject to bargaining. You'd have to figure that out. Right, but during the bargaining, in the moments before they resolve anything, what happens to the employee's health benefits? They have none? Again, I think the employer and the union can make an interim agreement and say, look, while you figure this out, let's just put them on the company health plan while we figure this all out. But the union didn't want to do that, right? They didn't want to do an interim in the company health plan, or did they? During the period of the strike, there was an interim. No, no, afterwards. After the strike's over, everybody goes back to work. We're no longer talking about crossovers. We're just talking about people, everybody's back to work. During the period before there is a new agreement, what happens to the employee's health care benefits? Like I said, I think you have to come to something like a quick interim agreement to just say, look, while we figure this out. Until that, they get nothing? Well, yeah, because they can't be covered in the trust fund. I mean, the trust fund benefits may carry over for a month. You know, there may be a lag month. But a vacuum on both sides of the bargain. That's right, and you can do short-term and long-term solutions, but it would be sufficient to collect a bargain. A couple other quick points I'd like to make, and I know I'm out of time here. As far as Cawthorn, which is a decision that the board relied on to establish that there was a waiver. It's our position that our case is distinguished well from Cawthorn, and that was misapplied. Cawthorn has very specific language. It says in the trust agreement that the employer signed on to it. This was not a subscription agreement. This was probably before subscription agreements were in place. The trust agreement, there's very specific language that says, at the expiration of the contract, the employer's obligation will terminate. It's not may, it says it shall terminate. So it's over and it's done. So the parties know when the employer signed that trust agreement in Cawthorn that, look, when this contract's up, your obligation is over. It's done. Whereas in our case, the cancellation language, the parties have to take an affirmative action. It doesn't automatically expire. An employer or a union has to take an affirmative action. Because in our case, you don't know if it's going to happen. In fact, it's rare for cancellation notices. Correct. Correct. And in our case, for example, in our case, our contract expired in 2007, but the employer didn't cancel right away. They continued to contribute well into 2008. So therefore, because the parties don't... They didn't exercise the option. That's correct. They didn't exercise the option. So therefore, in Cawthorn, the parties know what's coming. They can deal with it and they can bargain if they feel that's necessary because they know what's happening. In our case, we don't know if anybody's going to cancel. And so that's why if somebody makes the decision to cancel, that's why bargaining is required. Well, exactly. I guess in our case, if the employer says, look, we want you out of the pension plan. We want you out of the Western Conference Pension Plan. We're going to bargain about this and we're going to try to get, you know, the impact to get you out of the pension plan. That gives the union an opportunity to bargain, to bargain and talk about that, as opposed to the employer unilaterally just saying, boom, we're out of this. And so that's why the language in Cawthorn is different than our language. I would also argue that they know it would be improperly excluded extrinsic evidence in our case. Extrinsic evidence shows that these subscription agreements are ministerial agreements that serve the two purposes I talked about earlier, of keeping people in compliance with Section 302 as well as giving the trust and access to the federal courts. In his briefing, O'Carver talked about how, you know, these subscription agreements have been bargained and modified in the past. The unions were never able to fully rebut that testimony because the subscription agreements from the past were excluded from evidence and we weren't given the full right to cross-examine the labor relations person for O'Carver to ask him about have these subscription agreements ever been changed. And it's our position that if we would have been given that opportunity, it would have shown that these subscription agreements or ministerial documents haven't changed and people just sign on them at the request of the trust. You weren't proffering evidence that they couldn't be changed. You weren't proffering evidence that it was not possible to bargain only that in the past there hadn't been bargains, is that right? That's correct, yeah. And as far as, you know, our position was that the trust wouldn't change them. It's not a collectively bargained agreement, the subscription agreement. It's dictated by the trust fund. Any further questions? Okay, thank you very much. We'll hear from you in a little while. May it please the court, Jarrett Cantor on behalf of the National Labor Relations Court. The court has heard a lot of argument this morning. Before you get started, since we're all focusing on at least one question. Yes, Your Honor. We'd all like to get answered. What do you understand to be the status quo for health care benefits following the three lawful cancellations? Yes, Your Honor. And I want to point this court to the board's 2014 decision and order and specifically the remedy section there, which I think... What page are you on? Your Honor, that would be... It's JA 67, is that right? Yes, Your Honor. And that's the language I was reading before. The respondent shall be ordered upon the union's request to restore the status quo by ceasing to give effect to the unilaterally implemented company health care plan. Is that right? That's correct, Your Honor. Does not require continuing contributions to the trust, is that right? To the Oregon Trust, yes. To the canceled trusts, no. Absolutely not, Your Honor. I just want to be sure I understand. In your brief, where you say at page 18 to 19, when the employees return to work, the company unilaterally placed them into its company health care plan, rather than returning them to the prior union plan as required by law, that is a reference only to the Oregon situation and not the others? It's definitely to the Oregon. And as to the other health care, that, of course, presupposes then there is the... Because the duty is to return to the status quo, which was pre-strike. The cancellations then happen after the strike. So when you look at the board's remedy here, it's yes, there's the unfair labor practice for the unilateral implementation of its health care plan. But as to Oregon, it has to rescind that. But as to the other people receiving health care through any of the other trusts, and the board's remedy makes this clear, the company then can still... It can't be... On the request of the union, it then dislodges that. But it does not have to... That's not... It says, restore the status quo by ceasing to give effect to its unilateral implemented company health care plan. It doesn't say anything with respect to the contributions. With respect to the Oregon one, which is the next few sentences, it says with respect to, though, that trust, it has to continue to make contributions to that fund. Correct. And so the status quo, according to this order, seems to be, for Oregon, going back to making contributions to the trust. Correct. And for the others, nothing. Except the duty to bargain. Except the duty to bargain. And, again, the others, one of them is a health care one. The other ones are pension. I'm only worried about the health care for right now. Just the health care. Please stay with me on this, okay? With respect to health care, other than Oregon, your statement, rather than returning them to the prior union plan as required by law, there is no prior union plan required by law where they lawfully cancel. Is that correct? Correct. So you are only referring, then, here to the Oregon plan. To the Oregon, yes. And then on page 49, where you say, in addition, the answer to the company's posed question of what benefits the returning strikers would have is, simply stated, the benefits set forth in the expired bargaining agreement, including health care benefits through the trust funds, that is a reference only to Oregon, is it? Yes, your honor. So I don't understand how that's responsive. The company's argument is, what are we going to do about all of our employees in all these cases where they don't have any health care plan at all, at least as to where we've lawfully canceled? What are the benefits of the returning strikers in those cases? Well, that would have, then, been the bargaining. And certainly, it could have gone to impasse. It could have... But until impasse, the employees are just out of luck and have no health care law? Well, I think what the board's remedy also recognizes is that the company dislodges its company health care plan, and of course, we are many years after the fact now, upon the request of the union, and whether all of that has been mooted would come out in compliance, assuming there's a dispute at that point. But yes, assuming that this was essentially the board was actively involved in this case as it was going on day by day, that would be the conclusion there. And again, there are... I'm sorry. I got too complicated. That would be the conclusion there. If the board had been presiding over this at the moment the strikers are coming back, the board would have said, the Oregon trust has to be reinstituted, the contributions have to continue. The pension trusts you have lawfully canceled. And the health care trust. And the health care trust. Lawfully canceled. The unfair labor practice is the unilateral implementation of its own. So the employer says, I've got all these employees coming back to work. We still, the union and the employer, have not yet reached agreement on a new bargaining, collective bargaining agreement. The employer says, I want to have some provision for the employees until we do reach agreement, if we ever do. So it says, going to cover them under the company health plan. And let's assume for the moment that's not as generous as what was under the status quo of the old collective bargaining agreement. So if I'm an employee, I don't know, let's say 75% of my health care may be covered under the employees, under the employer's plan. But 100% is what the union wants and what it had under the old collective bargaining system. So from the employee's perspective, it's either I get nothing, or I get 75%. And maybe, if the party successfully bargains, there may be a provision in that new agreement for retroactive payments, giving me not only 75%, but another 25%. Is that the way the real world happens here? Your Honor, having never been involved in... And never been in the real world? No, Your Honor. Certainly, as opposed to my distinguished brothers at the bar, I have never been in that kind of position. Well, you're representing the board, and you're probably more familiar with the record than I am. And the concern I have here is trying to understand what the board is ordering. I mean, in the sense that, is the board's finding that there was a proper cancellation of contributions as to the three trusts? Yes. If that's the only issue, then the only question is, was it arbitrary and capricious for the board to refuse to allow the union to put on this other evidence to show that these subscription agreements are never bargained for? They're just something demanded by the trust, and the union has no option, basically, except to sign them. And that's over. Then, as to the unilateral action, it's the same thing. And the problem is just sort of trying to get a real world sense of what's happening out here, as opposed to we're sitting in, you know, a room talking about sort of this legal, theoretical situation. Whereas I thought some of the records suggested the employer was trying to figure out, I need to provide some coverage in the interim. They certainly, that was the claim that they were making, that they wanted to provide. And certainly, the company plan was what they had wanted from the beginning of the reopening of bargaining. That was the ultimate goal, was to get employees out of the expensive trusts and into the cheaper company health care plan. And that, through the strike and then through the, I mean, they got what they wanted in that sense. As to the excluded... They being the company? Yeah. So, the union says, but we have the statutory right, all right, to the status quo, not to the company health plan. And the response is, but you weighed that in the subscription agreement. Correct. When the employer lawfully canceled contributions. Correct, Your Honor. So, the union says, this will be a disaster to collective bargaining, for all the reasons that I think our questions are suggesting, in terms of trying to understand what this system is. And your response is, no, it won't, because these trusts don't have to have subscription agreements with these provisions in them. I don't know if the board has said the trusts don't have to have them in them. That's what I read your brief to say. It's not a disaster, because, in fact, you don't need to have subscription agreements with this language in it. I will look at my brief. I read it, I'm sorry. But, at any rate, that's what I understood. That might be the company's, I believe, the board's brief, I believe, my recollection of what we said was simply that this has been the board law for more than 30 years now, this jurisprudence, the Cawthorn line of jurisprudence. And that, as far as I'm aware, has not caused a calamity in the end of bargaining and the breakdown. So the union comes back and says, Cawthorn Trucking had this specific statement in it that said, everything ends when the collective bargaining agreement ends. That this is the first time that precedent has ever been applied to a situation here, as here, where it interferes with the status quo that's preserved under the statute as to bargaining. So isn't this a new application of Cawthorn Trucking? I don't think it's a new application, certainly it is the first case since Cawthorn that I'm aware of where there was specific enough language in the operative document, whether it's an essay in EU, other trust documents, or... But do you see the difference? And I just want to understand the board's position on this. It's one thing when the collective bargaining agreement itself says that the duty to make contributions is over when the agreement expires. It's another thing to have a separate subscription agreement, which at least the union is arguing, just takes the employer off the hook, vis-a-vis the trust, as to making contributions. Your Honor, the agreement in Cawthorn was a pension, was an EU. Yes. It was, again, not in the CBA, so it is similar to here. It was one of these agreements. What's the difference between an EU and an essay? My understanding is that EUs are used by pensions, and subscription agreements are used by healthcare trusts. But they're all three-party agreements. The ones in the record here are, there are signatures from all three parties on them, correct? The signature line from the trust says approved or accepted. The language varies there, but they all have been signed off. And the point that I was going to make when I first got up, and Judge Rogers, you had asked some very specific questions, and I want to make sure that the answers are very clear, and I'm going now to the estoppel theory. Preliminarily, one of the things I really want to point out, and has really kind of struck me in preparing for argument is, so the company is asking the court to impose waiver, and this is with regards to the Oregon Trust, the missing essay. The importance, and what really struck me in preparing for argument is, if the court were to grant that estoppel, the problem still arises that this is not a case where we have an example of what that essay would have been, what the subscription agreement would have been, what its language was, and the party simply couldn't find the signed one. For the court to go along with the company's estoppel, it would be essentially assuming then that the language in this agreement that no one has, and the trust says it doesn't require, actually would have satisfied the clear and unmistakable test. And I think that's something that really struck me in preparing for argument, is that the court would have to assume that, yes, it existed. But to grant estoppel, it would have to assume that the language in there would satisfy. And I think that's really what makes this case, you know, the company keeps talking about Manitowic ICE, and there the union was a software over the course of many years. It never protested or filed charges over that employer's numerous unilateral changes to profit-sharing plans, and during bargaining for a new CBA, it raised but then dropped the challenge to that position. And here, going back to the point I just made, the problem that I really see with estoppel is we don't actually know what this alleged thing would say. And to Judge Rogers' earlier questions, when the company asks, will you take the trust, will you take contributions for crossovers, the three trusts said, no, we cannot, because we need an SA or we need an EU. The letter from the Oregon Trust really stands out, because it doesn't say that. It doesn't say it needs an SA or an EU. It just says, we cannot accept, and then the companies, obviously you look to the company's letter, what it was asking could they accept on behalf of crossovers. And as the testimony makes clear, the Oregon Trust didn't accept because of selectivity rules, not because of an SA or an EU. And I also want to point out that afterwards, there's talk about the interim agreement and then the company being told, you need to sign the interim agreement and SAs or EUs for all of the trusts. When you look at that communication from the union, which had emails from the trust or the trust administrators attached, there's nothing there about signing an SA or an EU for the Oregon Trust. And I believe that had been explained to Judge Rogers, and the board respectfully believes that the evidence is as I just described it, not the other way around. And I would refer to Joint Appendix 972 to 975 makes that clear. I see I'm over my time. If the panel has no further questions. I just want to be clear again on what could have been done after the return to work with respect to the health care benefits. So, obviously, one thing that could have been done is just continue to negotiate. The employer wanted to go on the company plan. What did the union want to do in the interim until they reached CBA? The union, based on its view that there was no cancellations, the union wanted back the pensions and back the health care. And did they have an interim proposal until they reached a final agreement or not? The record's not clear with regards to overall bargaining during the discussions between Payne and whoever the union's representative, whose name was escaping me at the time. Okay. My recollection, without looking back at the testimony of what they said they were talking about, was that they were disputing what the status quo was with regards to health care. And the company's proposal was the status quo, what it believed was the status quo stemming from the interim, which is no pensions and its health care plan. And then it changed its position, and I believe it then said, still our health care plan, but back to the union's pensions. Again, the company's goal being throughout all this to get out of the union's health care plan. It seems to have contemplated maybe compromising its position and going back into the union pensions. And that's where then things left off when then the company's negotiator told the union, my authorization's been revoked to talk to you anymore. Overall negotiations are ongoing. Just before that, had the union offer asked for interim contributions to the health care plan of the trust or no? So during the period where they're trying to figure out what should happen to the strikers, did the union ask for contributions to, Your Honor, ask the pensions or the health care? I'm only interested in the health care. So on 13 of your brief, it says, this is Payne to Hobart, Oak Harbor would continue the following agreed upon status quo for returning strikers, which is as follows. Oak Harbor will cover the returning strikers under its company plans, pending a different agreement with the union on health and welfare. That was the employer's position. Yes. And what was the union's position? So the union's position on the status quo was that it was health care and pensions through the trust. Based on the union's position that that was the status quo, and obviously it continues to believe that the cancellations are all unlawful. If there are no further questions, the board rests on its brief and asks for its decision to be enforced. Is there any time remaining? All right. We'll give each of you another minute if you have an argument. A few points of clarification, Your Honor. There was nothing about signing the subscription agreements for the Oregon Trust. The union was involved throughout the process. It's not as if there was a separation between the trust and the union when it pertains to the Oregon Trust. And with respect to the Oregon Trust, what is the status quo? Well, you can look at the status quo from the conduct. The conduct of the union and the trust was that they were accepting contributions prior to the cancellation of the believed subscription agreement, and that would be whatever those contributions were and those benefits would be the status quo pursuant to the union's own conduct as to what the status quo was. It should be a stop from saying that, well, there was no subscription agreement, so it's whatever the status quo that we determined it to be. And with respect to the implementation of company medical benefits, there was an exigent circumstance that arose. Once it was determined that, as the board determined that the three Washington Trusts were validly canceled, the parties had bargained from February 17th to the 25th on an interim agreement pending an overall agreement. There were several proposals that the company made, each of which were rejected by the union, and then the union said, we're going to let the board decide this. That's classic impasse. The board, I'm sorry, the company at that point was faced with a decision, and it had an exigent circumstance similar to RBE Electronics citing the brief, St. Mary's Hospital citing the brief, you know, contractors citing the brief where it's a privilege to implement. The board's order faults the company for imposing, as it says, the company medical plan. But in fact, at least as I understand it, there's no actual penalty associated with that. I'm not aware of one. So the employees were covered by the company's plan. Looking backward and looking forward, the company doesn't have a right to impose the company's plan. On the other hand, unless something's worked out in the interim or forever, there's no matter. I guess that would be the board's order, and what the company is saying is that under extant board law, it's privileged to implement its healthcare plan to cover employees. Otherwise, they would be without coverage, and it did so consistent with prior board law. Are any of those previous cases where the economic exigency has to do with employee benefits? I don't know which benefits you're referring to, Your Honor. Well, any kind of employee benefit. When you say that there are those past cases about exigencies, my dim recollection of those cases is that they were about things of concern to the employer's economic success. But they were not things about benefits to the employees. They weren't wages. They weren't health benefits. They weren't pension. They weren't anything like that. I believe, if I'm not mistaken, it's male contractors. They would be losing healthcare coverage, the employees. What case is that? I believe it was male contractors. I believe that's the one. But there were three that we cited, and I'm not sure which of them is. In fact, there may have been two of them. The vacancy occurred because an agreement worked out before there was a union in the picture. It came to an end. I say provision for medical care. It expired. The provision was based on pre-union activity. It came to an end. That was it. What was the case of the employer exercising an authority given by GBA-associated documents? If there are no other questions, Your Honors, I would just reiterate that we ask that the court find no violation for cessation of contributions or for implementation of the company plan in order to remand back to the board for proceedings consistent with Manitoba guidance. Thank you. Thank you. We'll hear from the union for a minute, if you want. The union will close in response to what the NLRB said. It's our position that the NLRB confused determination of a contractual obligation with the trust fund, a third party with an employer's obligation to keep the status quo with the union who has a duty to collectively bargain with. Can I ask a question? Yes. I'm confused about that. Because the cancellation of the subscription agreement, that only canceled the subscription agreement.  We think those are two separate concepts. I understand what you're saying, but I think the court is confused about the continuation of the contract. It's our position to confuse those two concepts. Just because you canceled the subscription agreement, you still have a duty to bargain. Ideally, what's supposed to happen is a bargain impasse and then cancel the subscription agreement. It's also our position that our situation is distinguished from Cawthorn. There's different language. It's a different bargaining situation. Because it wasn't automatic, the employer had a duty to bargain impasse before canceling. Does the union not have a concern that the consequence of the decision is that until a new CBA is agreed on, there would be no health care in the circumstances of the lawfully canceled health care plans? Yes. I mean, yes. We, of course, want our members covered. We feel, yes. So, if that's the case, and if you accept, again, for purposes of this discussion, that the cancellations were proper, what do you want the union to do? Then NLRB's result is that there's no health care coverage during that period, right? Is that right? That seems like to be their position, that there's no company plan and they lawfully cancel the trust. So, is that in the best interest of your members? I mean, I can see an argument where it is. That is, the argument would be that puts you in a position to bargain now for the precise plan you want. Is that the answer, that we're willing to accept no benefits during this period because we don't want them imposing something that will then be impossible to dislodge? Is that the union's view? Well, look, obviously, we want health care covered for our members, and we don't like the situation where members don't have health care. But when they cancel those subscription agreements, they're out of the trust. They create a situation where they can no longer be part of the trust. That's of their own doing. So, the employer created this problem by not bargaining an impasse and canceling the subscription agreements first. So, we don't like it, but that's the situation we're in. So, we'll just have to, you know, get a result through bargaining. It's not proper for the employer to do anything until you reach a new agreement. That's correct. There could be interim agreements. Anything you don't both agree on. I'm sorry. Correct, yes. Correct. We'll take the matter under submission. Okay. Thank you.
judges: Garland, Rogers, Williams